UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DONOVAN L. CONRAD,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ZONAR SYSTEMS, INC.,<br><br>　　　　　Defendant. | CASE NO. C12-1068JLR<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |

## I.  INTRODUCTION

Before the court is Defendant Zonar Systems, Inc.'s ("Zonar") motion for summary judgment in this employment discrimination case.  (Mot. (Dkt. # 53).)  Plaintiff Donovan Conrad, who is 58 years old and African American, worked for Zonar as an electronics technician for approximately one month near the end of 2010 before he was terminated for "low productivity."  (*See* 2nd Am. Compl. (Dkt. # 51) ¶¶ 6, 13-14, 20-21.)  Mr. Conrad claims he was terminated because of his race, not because of his productivity.  (*See id.* ¶ 21.)  After discovery, Zonar brought this motion for summary judgment,

asserting that no reasonable jury could find in Mr. Conrad's favor on either of his two claims for employment discrimination. (*See* Mot.)

The court has reviewed the submissions of the parties including declarations, exhibits, and all other filings,[1] and concludes that summary judgment is appropriate for one of Mr. Conrad's discrimination claims but not the other. Mr. Conrad's failure-to-hire claim can be dismissed based on undisputed facts, but his wrongful termination claim cannot. The parties present very different versions of the facts with respect to that claim and support their assertions with competent evidence. As such, Mr. Conrad's claim must be submitted to a jury. The court GRANTS in part and DENIES in part Zonar's motion for summary judgment.

## II.   FACTUAL BACKGROUND

The parties agree on the basic facts underlying this case. They agree that Zonar is a Seattle company that provides electronic inspection, Global Positioning System ("GPS") fleet tracking, Radio Frequency Identification ("RFID") scanning, and management solutions for vehicle fleet operations. (*See, e.g.*, Koons Decl. (Dkt. #55) ¶ 1.) The parties agree that, in early November 2010, Zonar had two open positions in its

---

[1] Both parties have requested oral argument, but the court denies these requests. Oral argument is not necessary where the non-moving party would suffer no prejudice. *Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984). "When a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument]." *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*). "In other words, a district court can decide the issue without oral argument if the parties can submit their papers to the court." *Id.* Here, the issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the court. Accordingly, the court will not hold oral argument.

ORDER- 2

"Helpdesk," a department of the company that provides telephone technical support to Zonar's customers. (*Id.* ¶ 2.) On November 10, 2010, Zonar received Mr. Conrad's resume from Volt Technical Resources ("Volt"), a recruiting company, and decided to interview him for one of the open Helpdesk positions, the other having been recently filled. (2d Am. Compl. ¶ 7-12.) After an initial telephone interview, Zonar brought Mr. Conrad in for an in-person interview. (*Id.* ¶ 12.) The parties agree that Zonar ultimately did not hire Mr. Conrad for the remaining Helpdesk position (*id.* ¶ 14), and instead offered that position to a Caucasian woman named Deanna Jezek (Koons Decl. ¶¶ 3-6). Meanwhile, Zonar hired Mr. Conrad for a position in the "Return Merchandise Authorization" ("RMA") department. (*Id.*; 2d Am. Compl. ¶ 14.) The RMA department is responsible for repairing and refurbishing GPS units and other electronic equipment returned to Zonar by its customers. (Budelsky Decl. (Dkt. # 54) Ex. C & Enslow Decl. Ex. D (together, "Sheets 30(b)(6) Dep.") at 12, 122.) The parties agree that Mr. Conrad worked in the RMA department for roughly one month before Zonar terminated his employment. (2d Am. Compl. ¶¶ 20-21.)

Beyond these basic facts, the parties' versions of events differ markedly. According to Zonar, Mr. Conrad was a temporary employee who did not perform well enough for Zonar to retain him as a permanent employee. (*See* Mot. at 2-5.) Zonar claims it interviewed multiple candidates for the Helpdesk position and hired the candidate that was most qualified, Ms. Jezek. (*Id.* at 2 (citing Koons Decl. ¶ 2-6).) Zonar asserts that its decision to hire Ms. Jezek instead of Mr. Conrad was based on qualifications alone, not race or age. (*See id.*) Zonar claims it determined at Mr.

Conrad's interview that Mr. Conrad would not be a good fit for the Helpdesk position. (*Id.*) Zonar claims Mr. Conrad "tended to ramble" and was "overly technical" in his interview. (*Id.*) However, Zonar claimed to be impressed by Mr. Conrad's "elaborate technical side" and hired him for an RMA position instead. (*Id.* (citing Koons Decl. ¶ 6).) Zonar claims that, once hired, Mr. Conrad went through the same training process as every other new RMA technician. (*Id.* at 3 (citing Sheets Dep. at 17).) Nevertheless, Zonar asserts that Mr. Conrad performed poorly and did not process units at a fast enough rate relative to his peers. (*Id.* at 4 (citing Sheets Dep. at 27, 46, 49, 53-54, 110-12).) Zonar claims that Mr. Conrad's supervisor, Doug Sheets, counseled Mr. Conrad about these problems and clearly explained the parameters of the job. (*Id.* (citing Sheets Dep. at 46-49).) According to Zonar, Mr. Conrad was terminated only after he failed to increase his productivity. (*Id.* (citing Sheets Dep. at 51).)

Mr. Conrad presents a different version of events. Mr. Conrad alleges that Zonar has a "segregated workforce" that concentrates minorities in the RMA department. (Resp. (Dkt. # 57) at 1-2 (citing Enslow Decl. (Dkt. # 58) Ex. B ("Koya 30(b)(6) Dep.") at 46-47).) Mr. Conrad claims that Zonar fosters an atmosphere of racial isolation. For example, he points out that Zonar's president once referred to an unidentified black male as "Tyrone from Compton" in a work-related email. (*Id.* at 3 (citing Koya 30(b)(6) Dep. at 61-62).) Mr. Conrad claims he was qualified for a position at the Helpdesk because he has years of experience working in technical customer support and has good communication skills. (Mot. at 3-4.) In support of this assertion, Mr. Conrad filed two declarations from former colleagues who testify that he is personable and is a skilled and

ORDER- 4

effective communicator who consistently provides excellent technical support. (*See* Gerringer Decl. (Dkt. # 60); Werely Decl. (Dkt. # 61).) Mr. Conrad asserts that Zonar only put him in the RMA department after learning that he is African American. (Resp. at 3-7.)

Mr. Conrad presents evidence of specific events that he believes demonstrate Zonar's racial discrimination. First, he claims that his initial telephone interview went well and that Zonar was enthusiastic about his candidacy until it became clear that he was African American. (Resp. at 6.) He claims that the in-person interview was the first time anyone from Zonar learned his race, and the atmosphere quickly became "tense and unfriendly." (Resp. at 6 (citing Conrad Decl. (Dkt. # 59) ¶¶ 7-8).) He claims that after learning about his race, Zonar employees tried to "stump him" with difficult technical questions. (*Id.*) Second, Mr. Conrad presents evidence that the Helpdesk job for which he applied was part of the nearly all-white customer service department, and Zonar determined he was "not a good fit" for that department. (*Id.* at 7 (citing Koya 30(b)(6) Dep. at 46).) Mr. Conrad claims (and Zonar does not dispute) that Zonar hired two Caucasian applicants for the open Helpdesk positions instead of him. (*Id.*)

Mr. Conrad also presents evidence that Zonar put significant barriers in place to ensure that he did not succeed at Zonar. (*See* Resp. at 7.) He claims Zonar did not train him, denied him overtime, denied him access to the GPS units he was assigned to fix, denied him access to the tools he needed, gave him GPS units that were more difficult to fix than average, assigned him to a malfunctioning work station, never gave him a job description, and never described productivity expectations to him. (*See* Conrad Decl.

¶¶ 11-14, 18-20.) Mr. Conrad asserts that, despite these barriers, his productivity was commensurate with that of his peers. (Resp. at 10-11 (citing Enslow Decl. Ex. V).) He also claims that the productivity numbers Zonar relied on were unreliable for a variety of reasons. (*Id.* (citing Sheets 30(b)(6) Dep.; Conrad Decl. ¶ 18; Enslow Decl. Ex. X).) Further, he claims that the productivity numbers were pretextual, as evidenced by the fact that Zonar never tracked productivity before Mr. Conrad arrived and never did so again after he left. (Resp. at 13 (citing Sheets 30(b)(6) Dep.).) Finally, Mr. Conrad testifies that he was never counseled regarding his productivity nor told that his productivity was lacking. (Conrad Decl. ¶ 16-20; Budelsky Decl. Ex. A ("Conrad Dep.") at 122; Resp. at 10.) Mr. Conrad also presents evidence that Zonar misled the Equal Employment Opportunity Commission ("EEOC") in its investigation of his termination. (Resp. at 14-16.)

In short, Zonar presents evidence of one version of events and Mr. Conrad presents evidence of another. Zonar presents evidence that Mr. Conrad lacked the skill to succeed at his job, whereas Mr. Conrad presents evidence that he was set up to fail and forced out of his job at Zonar because of his race. The court's task is to sort through the evidence to determine whether a reasonable jury could find for Mr. Conrad on either of his claims.

### III.     ANALYSIS

**A.     Standard on a Summary Judgment Motion**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

ORDER- 6

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen*, 477 F.3d at 658. The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**B.     Legal Framework Under Title VII—The Burden Shifting Approach**

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination in federal employment based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-16. A person suffers disparate treatment in his employment when he or she is singled out and treated less favorably than others similarly situated on account of race. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

On summary judgment, employment discrimination claims are analyzed under the burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), if there is no direct evidence of discrimination. Under this approach, the employee has the initial burden of establishing a *prima facie* case of employment discrimination. *See, e.g.*, *Cornwell*, 439 F.3d at 1028. This creates a presumption of discrimination. *Id.* The burden then shifts to the employer, who must rebut the

presumption by producing admissible evidence showing a "legitimate, nondiscriminatory reason" for the challenged action. *Id.* If the defendant does this, the presumption of discrimination disappears and the burden shifts back to the employee to meet the ordinary standard of proof required for summary judgment. *Id.* Under that standard, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race. *Id.* This can be shown by producing evidence that (1) a discriminatory reason more likely motivated the employer; or (2) the employer's proffered explanation is unworthy of credence, i.e., the employer's legitimate, nondiscriminatory reason is actually a pretext for racial discrimination. *Id.*

Mr. Conrad alleges two different kinds of discrimination under Title VII and the Washington Law Against Discrimination, RCW chapter 49.60.[2] First, he alleges that Zonar discriminated against him on the basis of race by failing to hire him for the Helpdesk position and instead hiring him for an RMA technician position. Second, he alleges that he was wrongfully terminated from his job as an RMA technician because of his race. For each of these claims, Mr. Conrad has the initial burden of establishing a *prima facie* case of discrimination. The court analyzes each claim in turn.

**C.   Failure to Hire**

To establish a *prima facie* case of discrimination for a failure-to-hire claim under Title VII, a plaintiff must show that (1) he belongs to a racial minority; (2) he applied for

---

[2] In his complaint, Mr. Conrad also alleges claims for age discrimination and racial harassment. (*See* Compl. ¶¶ 29-30.) He has since abandoned those claims. (Resp. at 17 n.7.)

1 and was qualified for a job for which the employer was seeking applicants; (3) despite his
2 qualifications, he was rejected; and (4) after his rejection, the position remained open and
3 the employer continued to seek applicants. *Norris v. City & Cnty. of San Francisco*, 900
4 F.2d 1326, 1329-30 (9th Cir. 1990).

5 Mr. Conrad has not established a *prima facie* claim for failure to hire.
6 Specifically, he has not demonstrated element (3)—that he was rejected for employment
7 at Zonar. Indeed, Zonar hired Mr. Conrad for a position in the RMA department, and the
8 parties do not dispute this fact. Mr. Conrad argues that he was "rejected" by Zonar
9 because he was hired for a different position than the one he applied for. (Resp. at 7, 18.)
10 Mr. Conrad is correct that it could conceivably be an "adverse employment action" to
11 hire an applicant for a lower-ranking, lower-paying position than the applicant applied
12 for. *See Sibilla v. Follett Corp.*, No. CV 10-1457(AKT), 2012 WL 1077655, at *12
13 (E.D.N.Y. March 30, 2012) (citing *Ghosh v. New York City Dep't of Health*, 413 F. Supp.
14 2d 322, 332 (S.D.N.Y. 2006); *Coger v. Conn.*, 309 F. Supp. 2d 274, 284 (D. Conn.
15 2004)). However, there is no adverse employment action if the position sought and the
16 position offered have substantially the same salary, benefits, job duties, opportunities for
17 promotion, and so on. *Id.* (citing *Watson v. Paulson*, 578 F. Supp. 2d 554, 564 (S.D.N.Y.
18 2008); *Neitzke v. Husqvarna Prof'l Outdoor Prods., Inc.*, 529 F. Supp. 2d 1022, 1028 (D.
19 Neb. 2008)). Here, it appears to be undisputed that Mr. Conrad would have been paid the
20 same as either an RMA technician or a Helpdesk representative. (*See* Mot. at 3, 9;
21 Budelsky Decl. Ex. D at 58, 61; Enslow Decl. Ex. J.) The job duties, while not identical,
22 were similar: both involved servicing and troubleshooting Zonar's products and required

an employee with technical skill and experience. (*Compare* Sheets 30(b)(6) Dep. at 12 *with* Koya 30(b)(6) Dep. Ex. J.) Problematically, Mr. Conrad has produced no evidence that the RMA technician job he was offered was in any way a "lesser job" than the Helpdesk job he applied for.[3] Mr. Conrad has not made any showing that the RMA technician job had fewer benefits, fewer opportunities for promotion, or was otherwise "lower ranking" than the Helpdesk position. As Zonar points out, "[t]his is not a situation in which an applicant for a management position was offered a position in the janitorial department." (Mot. at 9.) Since Mr. Conrad was in fact hired by Zonar and has presented no evidence that he was offered a "lesser job" than the one he applied for, he has not met his initial burden of establishing a *prima facie* case of employment discrimination based on failure to hire. *See Sibilla*, 2012 WL 1077655, at *12. The court GRANTS summary judgment with respect to this claim.

### D. Wrongful Termination

To establish a *prima facie* case of discrimination for a wrongful termination claim under either Title VII or the Washington Law Against Discrimination,[4] a plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position he

---

[3] Mr. Conrad alleges generally that the RMA department is "less powerful and non-revenue-generating" than the customer service department (2d Am. Compl. ¶ 15), but he presents no evidence to support this assertion, nor does he present evidence of any material difference between the two jobs. Bare allegations are not enough on a summary judgment motion. *See Nichols v. Dancer*, 657 F.3d 929, 935 (9th Cir. 2011) (stating that bare assertions are insufficient to carry the day at the summary judgment stage absent some evidence to support them).

[4] The Washington Law Against Discrimination substantially parallels Title VII, so Washington courts look to federal law for guidance. *See Washington v. Boeing Co.*, 19 P.3d 1041, 1045 (Wash. Ct. App. 2000). Here, the parties treat the state and federal claims as one and the same, and the court sees nothing in the case law to suggest deviating from this course.

ORDER- 10

1  held; (3) he was terminated from that position; and (4) the job went to someone outside

2  the protected class. *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1093-94 (9th Cir.

3  2005).

4        Mr. Conrad easily makes this showing. First, there is no dispute that, as an

5  African American man, Mr. Conrad belongs to a protected class. (*See* 2d Am. Compl.

6  ¶ 6.) Second, he has produced evidence that he was qualified for the RMA technician

7  job—his resume shows years of relevant experience in electronics and product

8  troubleshooting. (Enslow Decl. Ex. I.) He also submits declarations from former

9  colleagues who describe him as a "highly qualified electronics technician with

10 considerable work experience" who is "very knowledgeable" and "consistently

11 provide[s] excellent support." (Werely Decl. ¶ 3; Gerringer Decl. ¶ 3.) Third, there is no

12 dispute that Mr. Conrad was terminated from his job as an RMA technician. (*See* Mot. at

13 4.) Finally, Zonar does not dispute that it hired a Caucasian male, David Egert, to replace

14 Mr. Conrad. (*See, e.g.*, Enslow Decl. Ex. S; *id.* Sheets 30(b)(6) Dep. at 50-51.) Thus,

15 Mr. Conrad has established all the elements of a *prima facie* case of wrongful

16 termination. *See Coghlan*, 413 F.3d at 1093-94. This creates a presumption of

17 discrimination and shifts the burden to Zonar to come forth with admissible evidence

18 showing a "legitimate, nondiscriminatory reason" for Mr. Conrad's termination. *See*

19 *Cornwell*, 439 F.3d at 1028.

20       Zonar meets its burden as well. Zonar asserts that it terminated Mr. Conrad not

21 because of his race, but because of his low productivity. Zonar asserts that Mr. Conrad's

22 "daily throughput of upgraded and repaired units was far below a reasonably productive

1 level and also below the output of his counterparts." (Mot. at 12.)  Zonar claims that Mr.
2 Conrad's supervisor, Mr. Sheets, compiled productivity statistics over a period of several
3 weeks to determine which employees in the RMA department were processing the most
4 GPS units. (*Id.*)  These productivity statistics represent potentially admissible evidence
5 justifying Zonar's decision to terminate Mr. Conrad. (*See* Budelsky Decl. Exs. E, F.)
6 Zonar claims the statistics show that Mr. Conrad was far slower than his peers. (Mot. at
7 12-13.)  If, in fact, this is the reason Mr. Conrad was terminated, it would constitute a
8 "legitimate, nondiscriminatory reason."  *See Cornwell*, 439 F.3d at 1028.  Since Zonar's
9 reason is supported by competent evidence, the presumption of discrimination disappears
10 and the burden shifts back to Mr. Conrad to meet the ordinary standard of proof required
11 for summary judgment. *See id.*  Under this standard, summary judgment is not
12 appropriate if, based on the evidence in the record, a reasonable jury could conclude by a
13 preponderance of the evidence that the defendant undertook the challenged employment
14 action because of the plaintiff's race. *Id.*  This can be shown by producing evidence that
15 (1) a discriminatory reason more likely motivated the employer; or (2) the employer's
16 proffered explanation is unworthy of credence, i.e., the employer's legitimate,
17 nondiscriminatory reason is actually a pretext for racial discrimination. *Id.*

18      Mr. Conrad has presented evidence sufficient for a reasonable jury to find that
19 Zonar terminated him because of his race.  First, Mr. Conrad presents evidence that there
20 is a culture of racial segregation and hostility at Zonar. (*See* Resp. at 21.)  He presents
21 testimony that Zonar's customer service department is predominantly white, whereas its
22 RMA department is "concentrated" with minorities. (Koya 30(b)(6) Dep. at 46-47 ("Q:

Ms. Koya, is it fair to say that the majority of employees who work in the customer service department are white? A: Yes. . . . Q: . . . Relative to other departments at Zonar, is the ratio of minorities to white employees in the RMA department higher? . . . A: Maybe, yes.").) Mr. Conrad testifies that a colleague nicknamed him "undercover brother" even though he objected to that name, and that the same colleague told him that "fried chicken is a black man's kryptonite." (Conrad Dep. at 118-19) And while it is unclear whether this colleague was a supervisor or a peer (*see id.*), there is undisputed evidence that the company's president at one point referred to an unidentified black male as "Tyrone from Compton," that the company's Human Resources director did nothing in response, and that the company's Human Resources director did not know this could be construed as a racially-charged pejorative (Koya 30(b)(6) Dep. at 61-62). All of this supports an inference of race discrimination, and on summary judgment the court must indulge that inference. *Harris*, 550 U.S. at 378.

Second, Mr. Conrad presents evidence that Zonar's "low productivity" justification is pretextual. Specifically, Mr. Conrad attacks Zonar's principal evidence supporting its productivity claim—a set of productivity figures compiled by Mr. Sheets while Mr. Conrad was employed at Zonar. (*See* Budelsky Decl. Ex. F.) The statistics track daily "throughput," which represents the number of GPS units repaired or upgraded by a particular employee in any given day. (*See id.*) The statistics show that Mr. Conrad averaged 8.18 units per day over a roughly four-week period. (*Id.*) The statistics also show that Mr. Conrad's colleagues averaged 0.33, 9.67, 13.25, and 16.5 units per day, respectively, over the same period. (*Id.*) Mr. Conrad points out that his numbers were

1 not vastly different from his colleagues, none of whom were ever counseled, let alone
2 terminated, for lack of productivity. (Resp. at 11-12.) Along these same lines, Mr.
3 Conrad notes that (1) his productivity never dropped to zero in a single day, although it
4 did for all of his colleagues, (2) he had many days that were very productive including
5 one in which he was the most productive of all RMA technicians, and (2) none of the
6 RMA technicians met Mr. Sheets' initial productivity target of 22.5 units per day but Mr.
7 Conrad was the only one singled out for low productivity. (*See id.*; Sheets 30(b)(6) Dep.
8 at 72.)

9       Mr. Conrad also points to more substantial concerns with the productivity
10 statistics. To begin, the numbers do not account for the fact that some GPS units would
11 take longer than others to repair or upgrade, or the fact that a repair would take longer
12 than an upgrade. (*See* Sheets 30(b)(6) Dep. at 131-33.) Mr. Conrad testifies that he had
13 to get GPS units from other technicians, and that they gave him the units that failed initial
14 tests and were therefore more difficult to repair. (*Id.*; Conrad Decl. ¶ 19.) He also
15 testifies that he repaired units more than he upgraded them, unlike many other RMA
16 technicians. (Conrad Decl. ¶ 10.) The numbers do not account for the fact that Mr.
17 Conrad, unlike his colleagues, was a new employee who was hired only six days before
18 Mr. Sheets began tracking productivity. (*See* Sheets 30(b)(6) Dep. at 57-58, 60-61.) The
19 numbers do not account for the fact that other employees were permitted to work
20 overtime but Mr. Conrad was not. (*See* Sheets 30(b)(6) Dep. at 55; Koya 30(b)(6) Dep.
21 at 50-52; Conrad Decl. ¶ 18.) The numbers do not account for Mr. Conrad's claim that,
22 at times, he simply had no GPS units to work on. (Conrad Dep. at 114.) The numbers do

not account for Mr. Conrad's claim that his work station unexpectedly malfunctioned one day, making further repairs difficult or impossible on that day. (Conrad Decl. ¶ 19; Sheets 30(b)(6) Dep. at 133-34.)

Perhaps most troubling is the fact that Zonar (and Mr. Sheets) only began tracking productivity statistics after Mr. Conrad was hired and ceased tracking them several weeks after Mr. Conrad was terminated (and after it had been established that Mr. Egert was more productive than Mr. Conrad). (Sheets 30(b)(6) Dep. at 57-58, 60-61.) Zonar did not track productivity at any other time. (*Id.*) This supports a reasonable inference that the productivity tracking was a pretext for terminating Mr. Conrad. On a summary judgment motion, the court must draw this inference in Mr. Conrad's favor. *Harris*, 550 U.S. at 378. Taken as a whole, these concerns demonstrate that a reasonable jury could find that Zonar's proffered explanation for terminating Mr. Conrad is unworthy of credence. *See Cornwell*, 439 F.3d at 1028.

There is more evidence of discrimination as well. Mr. Conrad presents evidence that there are suspicious circumstances surrounding his being hired into the RMA department. Namely, he testifies that his in-person interview quickly became "awkward . . . tense and unfriendly" as soon as Zonar employees realized he was African American. (Conrad Decl. ¶¶ 7-8.) Also, contrary to ordinary procedure, Mr. Sheets was not consulted before Mr. Conrad was hired into the RMA department, nor was there actually an opening in that department at the time he was hired. (Enslow Decl. Ex. P at 6.) These facts, if true, support an inference (which the court must indulge) that Zonar hired Mr. Conrad into the RMA department as part of an effort to avoid a failure-to-hire

ORDER- 15

1 claim, then subsequently set him up to fail in that position. This theory is supported by
2 Mr. Conrad's evidence that Zonar put in place substantial barriers to his success as an
3 RMA technician. (*See, e.g.*, Conrad Decl. ¶¶ 11-14, 18-20; *see generally* Resp. at 7-11
4 (explaining "barriers to success" theory and citing evidence).)

Given all of this evidence, the court concludes that a reasonable jury could find by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race. *See Cornwell*, 439 F.3d at 1028. Accordingly, summary judgment is inappropriate in this case for Mr. Conrad's wrongful termination claims.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Zonar's motion for summary judgment (Dkt. # 53), granting the motion with respect to Mr. Conrad's failure-to-hire claim and denying the motion with respect to his wrongful termination claim.

Dated this 11th day of December, 2013.

JAMES L. ROBART
United States District Judge